OPINION OF THE COURT
Arthur S. Hirsch, J.
This is a motion to confirm an arbitration award rendered by a rabbinical court.
In 1973, a lease was executed between property owner Air Host Motel Company (Air Host), a partnership, and lessee Wild Air Enterprises Corp. (Wild Air) for a certain premises in Queens to be operated as a nursing home by respondents, who are the stockholders and principals of Wild Air. Negotiations on behalf of the landlord were conducted principally by Ulo Barad, one of the partners and, to a lesser degree, by other partners. The rental provided for in the lease was $25,208.33 monthly.
In 1977, respondents contacted Barad as the partner who had represented the landlord and informed him that be *549 cause of business reverses they would have to vacate the premises unless a substantial reduction in the rent could be effectuated. Negotiations with the respondents, Barad and the parties’ respective attorneys commenced and an oral agreement was reached to reduce the rent by $8,000 per month. Problems arose later in obtaining the confirmation of the other partners to the modification negotiated by Barad on the partnership’s behalf, but this was apparently resolved, because on November 15, 1977, a written agreement was presented to respondents and was executed, signed by respondents on behalf of the corporation and Barad on behalf of the partnership, reflecting the oral reduction agreement.
Again, in the spring of 1978, a further reduction was requested by respondents and this time the parties agreed to a temporary reduction with provisions for subsequent increases which would bring the rental back to its original level, depending on certain contingencies.
During the negotiations, respondents had met with other partners besides Barad, but at no time had they come in contact with petitioner or with his father, who acted as his son’s surrogate in the arbitration proceedings and from whom petitioner had received the 6 % interest in the partnership. There is, at present, a dispute between the partners of landlord Air Host and a separate action for an accounting is pending in Queens County.
In November, 1977, respondents received notice from the Union of Orthodox Rabbis to appear before a rabbinical court for a “Din Torah” or arbitration of a claim brought against them by petitioner. Respondents testified they refused to appear at first on grounds that they had no knowledge of petitioner, but did appear after receiving written notice that refusal would result in the court’s invoking a “sirov.”
The first meeting of the rabbinical court, presided over by the requisite three rabbis, took place on Sunday, May 14, 1978. The respondents appeared with their attorney, who was present as their legal representative and to testify as witness to all meetings between landlord Air Host and *550 tenant corporation Wild Air, at which the attorney was present.
Respondents are persistent in their claim that theirs was a special appearance before the rabbinical tribunal to establish that there was never a business nor contractual relationship between the claimant and themselves, and therefore, a Din Torah, or arbitration, would be improper and invalid. Their participation thereafter was to obtain a determination on this limited issue, i.e., whether a Din Torah should be convened and not for a determination as to the merits of the claim.
The respondents were required by the court to sign a Hebrew Document entitled a “Mediation Note” which, in effect, is an agreement to voluntarily arbitrate “the dispute existing” between the parties. Respondent Asher Scharf, who has a complete understanding of the Hebrew language, contends that much discussion ensued until it was unequivocally established that the “dispute” referred to in the “Mediation Note” was the question of the propriety of having a Din Torah and that he overcame his conceded reluctance to sign the document when he was assured by the court of the limited scope of the dispute. Respondents were summoned and attended two additional meetings. At the insistence of the rabbinical court, respondent’s attorney did not attend any meeting after the first. On December 31, 1978, a written judgment of the rabbinical court was rendered, in which respondents were directed, among other things, to pay to petitioner a lump sum of $9,000 and to make monthly payments of 6% of $23,000, representing petitioner’s share of the rental due and owing to the landlord Air Host.
Petitioner has moved for an order confirming the award, with respondents opposing and moving to vacate the award on numerous grounds.
RABBINICAL COURT — DIN TORAH
As earlier indicated, the customary arbitration proceeding was not utilized by the parties. An accepted, but more unusual forum was selected, that of arbitration by a tribunal of rabbis conducting a Din Torah.
*551 The beginnings of Jewish arbitral institutions are traceable to the middle of the second century. Throughout the centuries, thereafter, in every country in which Jews have been domiciled, Jewish judicial authority has existed, via the institute of arbitration conducted by special rabbinical courts. Orthodox Jews, prompted by their religious, national feelings, accepted Jewish judicial authority, by resorting to the arbitration procedure of their own free will (Elon, Principles of Jewish Law, Arbitration, p 566). This method of arbitration has the imprimatur of our own judicial system, as a useful means of relieving the burdens of the inundated courts dealing with civil matters. Through Talmudic sages, it is learned that special rules or procedures have been provided under which the rabbinical courts function as a Din Torah (literally translated as torah judgment), with Judaic or torah law as its basis. As examples, it was required that a deed or note of arbitration be drawn confirming the consent of the parties to submit to arbitration; a decision on a matter not included in the issues submitted renders the determination by the rabbinical court void pro tanto; if an award was made without giving both parties opportunity to be fully heard, or if the judges acted otherwise improperly, the decision is voidable (Elon, Principles of Jewish Law, Arbitration, pp 567, 569).
In addition to the procedural rules established by Judaic Law, there are State, civil, procedural rules for arbitration (CPLR article 75) to which the rabbinical court, as an arbitration forum, must also adhere.
ARBITRATION AWARDS
When parties consent to any type of arbitration, they effectively agree to accept whatever solution is reached by the arbitrators for the arbitrators’ determination on the merits is conclusive. It is an arbitrator’s duty to seek a “just solution” and he does so unhampered by principles of substantive law or rules of evidence (Matter of Bay Iron Works [Einstein], 17 AD2d 804; McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7511:5). A court may not review questions of fact or even of law (Matter of SCM Corp. [Fisher Park Lane Co.], 40 NY2d 788, 793).
*552 The Legislature has prescribed as the exclusive method of attacking an arbitration award, the establishing of grounds statutorily authorized in CPLR 7511 (Farino v State of New York, 55 AD2d 843). This is done on motion except where issues of misconduct are convincingly alleged, and then it is essential that a hearing be conducted to determine such issues (Matter of Britt [Muller Bros.], 22 AD2d 678). Acts of misconduct having been set forth and alleged in the instant motion, the parties were required to appear at a full hearing before this court.
Respondents mount a four-tiered challenge against the rabbinical court’s award, claiming first, the arbitration agreement was entered involuntarily, under duress and is consequently void, second charging the arbitrators with misconduct, third, with exceeding and imperfectly executing their power, and fourth, failing to follow statutorily required procedure.
INVOLUNTARY AGREEMENT — DURESS (CPLR 7511, SUbd [b], par 1, cl [i])
Both parties are members of the orthodox Jewish community. Respondent’s denial of the existence of any disputable issue between themselves and petitioner convinced them to refuse to appear for a Din Torah and they would not have done so had they not received the threat of a “sirov.” Rabbis testifying for respondents stated that a sirov, literally translated as contempt of court, is a prohibitionary decree that subjects the recipient to shame, scorn, ridicule and ostracism by his coreligionists, fellow members of his community. Ostensibly, he is ostracized and scorned. Other Jews refuse to eat or speak with him. He is discredited and dishonored. The respondents maintain that the draconian measures of a sirov are sufficiently threatening so as to compel their compliance with the demand to appear. They claim they would have become outcasts among their friends and coreligionists. However, from other testimony, it appears that the sirov, while most assuredly ominous in its potential power, is honored in its breach. The court cannot, of course, know the actual state of mind of respondents and it may be that their fear of a ■irov decree was real. However, it seems more plausible *553 that if respondents believed the consequences so fearful, they would not, at this point be willing to defy the rabbinical court by refusing to accept the arbitrator’s determination. Undoubtedly, pressure was brought to bear to have them participate in the Din Torah, but pressure is not duress. Their decision to acquiesce to the rabbinical court’s urgings was made without the coercion that would be necessary for the agreement to be void.
MISCONDUCT
CPLR 7511 (subd [b], par 1, cl [i]) allows for the vacation of an award if the rights of a party are prejudiced by corruption, fraud or misconduct. Courts have used the term misconduct to denote actions of fundamental unfairness, whether intentional or unintentional (8 Weinstein-Korn-Miller, NY Civ Prac, par 7511.15).
Respondents charge misconduct by the rabbinical tribunal in their refusal to permit respondents to have legal representation and, further, to hear testimony or accept material documents offered by respondents’ attorney, as witness to the lease negotiations. This, they contend, violated their due process rights. Respondents appeared at the first meeting with their attorney, Abraham Bernstein. From the beginning, it become apparent the tribunal would not tolerate the presence of an attorney at a Din Torah. Petitioner’s father strenuously objected, claiming he had no attorney to represent petitioner. At first, attorney Bernstein was not permitted to speak, but later was allowed to make a short statement in which he attempted to establish the fact that a lease was executed between the corporation tenant and the landlord partnership without personal involvement of the parties and when he offered to submit the lease and other documents for the perusal of the court, the papers were returned to him. Thereafter, he interjected himself wherever possible to explain respondents’ position regarding the lack of legal connection between the parties. For the most part, the court refused to acknowledge him, quelling his attempts to speak or take part in the proceedings. He was not permitted to ask questions of petitioner or his father, who at all times acted as representative and voice of petitioner.
*554 Bernstein did insist upon clarification of the “Mediation Note” and then specifically stated that respondents were not agreeing to arbitrate on any claim, but rather agreed only to submit for a ruling on the limited jurisdictional question of whether a Din Torah was warranted.
The tribunal made it clear to respondents that no attorney need appear at subsequent sessions and respondent Asher Scharf testified that he was reminded of this directive at subsequent times.
Biblical law requires that parties appear before a magistrate in person and not by proxy (Deuteronomy 19:17). For many years, this supported a Jewish judicial prejudice against proxies, including attorneys and even interpreters, it being determined essential that argument be heard directly from the mouths of litigants or witnesses (Makkoth 1:9, Maimonides, Mishna Torah [Yod Hazakah] Sanhedrin 21:8). There was a tradition, however, that the high priest, when sued in court, could appoint an attorney to represent him (Talmud Yerushalmi, Sanhedrin, 2:1, 19d). It may be this tradition that precipitated the admittance of defense attorneys into rabbinical courts. Where the parties were present to give testimony, thus permitting Judges to perceive their demeanor and evaluate their credibility, legal counsel was no longer considered to be anathema (Elon, Principles of Jewish Law, supra p 574). The rabbinical court in the instant matter obviously did not abide by this accepted legal concept.
The tribunal’s proclivity for conducting their court under outdated concepts resulted in inadvertent violations. Respondents were denied due process. The right of counsel, which is a constitutional right, is further enunciated in CPLR article 75, and is an unwaivable right (CPLR 7506, subd [d]). Consequently, respondent’s participation without counsel, after receiving the court’s warning to appear alone, did not have a negative effect on their inherent right to legal representation, the deprivation of which is sufficient to vitiate the award.
Respondent Asher Scharf’s unrebutted testimony indicated that at a session he attended, one of the three rabbi arbitrators called him out to talk with him privately. The *555 rabbi argued for a cash settlement, to be paid by respondent on the grounds that petitioner was a poor student. Scharf testified the rabbi asked, “Well, what does a few thousand dollars mean to you?”
Under Judaic law (Deuteronomy 1:17), a Judge must judge impartially in favoring the rich or the poor. In an interpretation of this portion of the Torah, the foremost authority, Rashi, in Commentary Rashi, states that the version should be understood as follows: A Judge “should not say: ‘This is a poor man and his fellow (opponent) is rich and he will consequently obtain some support in a respectable fashion’ ” (see Rashi on Lev, XIX 15).
To ensure fairness, it is axiomatic and imperative that an arbitrator’s impartiality be above suspicion (Matter of Friedman, 215 App Div 130, 136). The rabbinical court was obviously prejudiced against respondents because of their affluence and considered the financial status of the parties above the issues. Such conduct, forbidden by the Torah, the law under which the rabbinical court has jurisdiction, constitutes another instance in which the tribunal deviated from its own Din Torah precepts.
The procedural format of the sessions was haphazard; no prescribed order was followed. A rabbinical court normally operates in a set manner, with presentation of claims, counterclaims, testimony of witnesses and cross-examinatians conducted in a fairly orderly manner. This is not to say that any formal hearings are required. However, it appears that no semblance of administrative court proceeding, formal or informal, was followed by this rabbinical court. Witnesses were not called, real evidence was not accepted and no recognizable and required Din Torah procedure was followed. Under these highly unusual and chaotic conditions, a fair award could not be given.
At the sessions at which respondents appeared, the predominant discussion pivoted on the jurisdictional question. No witnesses testified on the issue of merit. As indicated earlier, respondents’ attorney was not permitted to testify as to the lease transaction. A court’s refusal to hear pertinent and material evidence constitutes misconduct (Gervant v New England Fire Ins. Co., 306 NY 393).
*556 FAILURE TO FOLLOW STATUTORY PROCEDURE (CPLR 7506, 7511, subd [b], par 1, cl [iv])
Respondents argue that the failure of the arbitrator to be sworn is fatal and voided the proceedings (Hinkle v Zimmerman, 184 NY 114). From the testimony, it is graphically clear that during all of the rabbinical court proceedings a multiplicity of objections to various aspects of the proceedings were raised, but none were addressed to the omission of having the arbitrators sworn and, inasmuch as the proceedings continued, this constitutes a waiver (CPLR 7506, subd [f]). With the exception of a representation of counsel, all procedural errors unobjected to are waived if the parties continue to appear at the proceedings (Matter of Kozlowski v Seville Syndicate, 64 Misc 2d 109). ARBITRATOR EXCEEDING HIS POWER — IRRATIONAL CONSTRUCTION (CPLR 7511, subd [b], par 1, cl [iii])
A party’s legal rights are precious and he may not be compelled to relinquish any substantial rights. However, when a litigant agrees to arbitrate, he does give up certain rights and it would be grossly unfair for him to do so through misapprehension or through inveiglement or subtlety (Matter of Marlene Inds. Cory. [Carnac Textiles], 45 NY2d 327, 334).
The respondents made it graphically clear that they understood the “Mediation Note” or arbitration agreement to limit the scope of the “dispute” on a jurisdictional issue and not on the merits of the claim. There was no testimony to show that the Judges attempted to dissuade respondents from this belief. The jurisdictional issue was thus limited by the intent and agreement of the parties. A determination on the merits of the claim was outside the scope of the agreement and the power of the arbitrators.
Errors of law, on the other hand, do not indicate an excess of power to vitiate an award (Matter of Granite Worsted Mills [Aaronson Cowen, Ltd.], 25 NY2d 451, 455). The fact that the court ignored the established legal concept that stockholders of a corporation have limited personal liability and are protected from personal judgment for corporate debts does not constitute misconduct or an excess of power.
*557 By far, most damaging to the argument for confirmation of the award is the irrationality of the decision (see Matter of National Cash Register Co. [Wilson], 8 NY2d 377, 383). The parties involved in this proceeding had no, or at best peripheral, connection with each other. There may be a disputable issue between petitioner, a minor partner, as against the partnership itself, for an accounting or for charges of misconduct by some of the partners. In fact, these are. the very litigants in a partnership accounting proceeding pending in another county. There may also be a disputable issue between the partnership itself and their corporate tenant. But as between the petitioner and the respondents, there is no nexus, legal or otherwise, that would lend itself to a dispute or an adjudication. The rabbinical arbitrators, limited to the issue of whether there was a dispute between these parties that would warrant a Din Torah, exceeded their jurisdiction by awarding a cash settlement to petitioner, a minor partner, to be paid personally by principals of tenant corporation. The arbitrators, by their determination, executed a business contract where none ever existed. There is no rational basis for this award and it cannot stand (see Matter of Furstenberg [Aetna Cas. & Sur. Co.], 49 NY2d 757, 759).
Despite the established and well-grounded precedent that courts rarely set aside an arbitration award, in this instance the court finds it obligatory to vacate the award of the rabbinical court for the reasons enunciated above. A new arbitration proceeding will not be scheduled, as the court is convinced that no legal dispute exists between these particular parties.
Accordingly, the motion to confirm the award is denied and the motion to vacate the award is granted.