OPINION OF THE COURT
Edward W. McCarty III, J.
This application places in uneasy juxtaposition a determination of an orthodox rabbinical tribunal known as the Monsey Bais Din and the provisions of the CPLR involving arbitration. (CPLR art 75.) The petitioners and respondents respectively seek to annul and to enforce a determination of the rabbinical tribunal by resort to the secular courts of this State. Despite clear legal authority for such an exercise (Matter of Meisels v Uhr, 79 NY2d 526), the following discussion will amply demonstrate the difficulties posed in attempting to "shoehorn” an ecclesiastical determination into the arbitration procedures of the secular courts.
The petitioners and respondents are commercial coventurers and are related by blood and marriage. Each is a member of an orthodox Jewish congregation. Various and sundry disputes arose between the parties which originally formed the basis for a lawsuit in the Supreme Court, Westchester County. Petitioners were then advised by Rabbi Moshe Tendler, the rabbi of the Community Synagogue of Monsey, that Jewish law required that such disputes be submitted to a rabbinical tribunal for determination. Petitioners then withdrew the Supreme Court action and agreed to submit their disputes to the Monsey Bais Din. About this and much else there are bitter factual disputes.
The rabbinical tribunal described the conflict between the parties as a "painful” one and the wisdom of that observation has become even more apparent since the opinion of the Bais Din was issued. The religious leadership of the orthodox community has now been dragged into the parties’ internecine warfare. Despite the existence of certain factual issues, I believe that this matter can be determined on the basis of the papers submitted. Therefore, I will decline the petitioners’ invitation to further inflame this situation. Subjecting the parties and the religious leaders involved to the public specta *762 cle of hearings to determine whether their conduct satisfied the petitioners’ standards, the CPLR, and Jewish law would serve no purpose.
I believe another qualification is in order. Much of what follows addresses the variations between the procedures employed by a rabbinical tribunal and the procedures contemplated by CPLR article 75 governing statutory arbitration. In my view, those variations are dispositive, but not because I believe that the CPLR requirements guarantee a wiser or more just result. They do not, and to so hold would be an affront to the deep religious convictions which underlie this proceeding. It is the differences between the systems and not their respective merits which are controlling.
The events immediately following petitioners’ withdrawal of their civil action are crucial. The respondents claim that Rabbi W. Berel Wein advised Hyman Fein that he knew all of the parties, that Arthur Fein’s son attended the Yeshiva with which Rabbi Wein was associated, and that he had an ongoing financial relationship with Arthur Fein. When Rabbi Wein, at the instance of his fellow rabbis, prepared to expand further on this relationship, it is alleged that Hyman Fein declined further explication. The respondents also argue that Hyman Fein, as a rabbi and member of the orthodox community, would have been aware of the substance of the story which Rabbi Wein was about to recount.
The relationship between Rabbi Wein and Arthur Fein can be briefly stated, and petitioners’ contentions notwithstanding, I can discern nothing venal about it. For approximately 10 years, Arthur Fein made repeated interest free loans to Rabbi Wein to be utilized in connection with the operation of his Yeshiva. The loans, to a maximum of $5,000, were made on several occasions during each year over a 10-year period. Although the loans went to fund the Yeshiva, they were the personal obligations of Rabbi Wein. This was, in sum, a significant, ongoing and long-term personal relationship, one which could not have existed without deep seated feelings of trust on both sides.
The petitioners deny receiving disclosure of this relationship, or of facts sufficient to impose a duty to inquire. The respondents dispute this as do the members of the rabbinical tribunal. The issue with respect to petitioners Victor and Andrew Fein is far less defined than in the case of Hyman Fein.
*763 In all events, such disclosure as occurred antedated the parties’ execution of a written agreement to submit their disputes to the Monsey Bais Din. The submission agreement, known as the Shtar Buerrin designated Rabbis Mordecai Tendler, Berel Wein and Abraham Pessin as the Bais Din to determine the disputes between the parties. The agreement contained the following provisions:
"1. The undersigned parties hereby voluntarily submit the present matter in controversy, as set forth in the attached statement of claim, answers and all related counterclaims and/or third party claims which may be asserted to arbitration by the Bais Din in accordance with Jewish law as set forth in the Shulchan Oruch [Code of Jewish Law] as interpreted by the Bais Din.
"2. The undersigned parties agree that any and all hearings in connection with this arbitration shall be held as such times and places as may be designed [sic] by the Bais Din. The undersigned parties further agree and understand that the arbitration will be conducted in accordance with Jewish law as set forth in Shulchan Oruch as interpreted by the Bais Din.
"3. The undersigned parties further agree to abide by and perform an award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest or penalties due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.”
This agreement was executed on March 8, 1993 by the petitioners and respondents, and after several sessions before the Bais Din, the rabbinical court announced its determination. Obviously dissatisfied with the tribunal’s conclusions, the petitioners now seek to set aside the decision of the Bais Din, alleging a host of procedural and substantive errors and sundry other misconduct, including the claim of bias on the part of Rabbi Wein. The respondents seek to enforce the award as does the Bais Din. Utilizing its ecclesiastical authority, the Bais Din imposed sanctions on the petitioners which resemble, if they do not equal, an excommunication. The key to this puzzle is the issue of bias. Initially, I must concede that I can discern no basis for a claim of actual bias on the part of any arbitrator. Under the circumstances presented here, I do not believe that such a showing is required. It is clear that a *764 substantial ongoing financial relationship between Rabbi Wein and Arthur Fein was not disclosed to the petitioners in full prior to their execution of the submission agreement. The existence of such a significant undisclosed relationship must call into question the voluntariness necessary in the selection of an arbitrator.
"Because arbitration is at bottom a consensual arrangement, resolution of this delicate question of disqualification, which has proved so vexing to the courts, ought to be resolved in the first instance by the parties to the agreement. As Mr. Justice White stated, concurring in Commonwealth Coatings (393 U. S., at p. 151), 'The judiciary should minimize its role in arbitration as judge of the arbitrator’s impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are better informed of the prevailing ethical standards and reputations within their business.’ This can only be achieved if, prior to the commencement of the arbitration, the arbitrator discloses to the parties all facts which might reasonably cause one of them to ask for disqualification of the arbitrator.” (Matter of Stevens & Co. [Rytex Corp.], 34 NY2d 123, 128.)
I cannot conclude that Rabbi Wein is responsible for not disclosing the relationship with Arthur Fein, but I also cannot conclude that the petitioners’ failure to receive such information was harmless error. The respondents argue that the petitioner Hyman Fein, as a rabbi active in the orthodox Jewish community, was on notice of facts which should have prompted further inquiry. (Matter of Lincoln Graphic Arts v Rohta/New Century Communications, 160 AD2d 871.) While there exists a duty to inquire, the primary duty to disclose remains with the arbitrator.
"This does not mean that a party to an arbitration may sit idly back and rely exclusively upon the arbitrator’s disclosure. If a party goes forward with arbitration, having actual knowledge of the arbitrator’s bias, or of facts that reasonably should have prompted further, limited inquiry, it may not later claim bias based upon the failure to disclose such facts. While such responsibility to ascertain potentially disqualifying facts does rest upon the parties, the major burden of disclosure properly falls upon the arbitrator. After all, the arbitrator is in a far better position than the parties to determine and reveal those facts that might give rise to an inference of bias. Further, the very nature of the arbitrator’s quasi-judicial function, particularly since it is subject to only limited judicial review, de *765 mands no less a duty to disclose than would be expected of a Judge (Commonwealth Corp. v. Casualty Co., 393 U. S., at pp. 148-150, supra; Matter of Labor Relations Section v. Gordon, 41 A D 2d, pp. 27-28, supra) * * *
"By our determination we do not hold that any kind of business relationship would disqualify a prospective arbitrator, but we do hold that in the interest of fairness (and to avoid just such a litigation as we deal with here) all arbitrators before entering upon their duties should make known any relationship direct or indirect that they have with any party to the arbitration, and disclose all facts known to them which might indicate any interest or create a presumption of bias.” (Matter of Stevens & Co. [Rytex Corp.], 34 NY2d 123, 129-130, supra.)
But, the respondents must surely respond, Rabbi Wein’s attempts at full disclosure were thwarted by Hyman Fein. I will assume this to be so and further assume that Hyman Fein’s actions can be imputed to his copetitioners. Even given those assumptions, I do not believe that the nondisclosure can be disregarded, because of the unique substantive and procedural characteristics of a Bais Din.
The duty of inquiry posited by respondents is clearly appropriate in a garden variety commercial arbitration. In such a case, the parties’ submission will often be their only contact with the arbitrator. Here, all parties concede that the milieu for the events in question was a tightly knit religious community. The duty to inquire of a commercial arbitrator regarding possible bias does not readily translate to the close questioning of a spiritual leader entrusted on a continuing basis with both temporal and spiritual matters.
Were the inquiry to end at this point, I believe that the question still might fairly be in doubt. However, I believe other marked dissimilarities between commercial arbitration contemplated by CPLR article 75 and the conduct of a rabbinical tribunal are dispositive.
I begin with the basic premise that arbitration cognizable under CPLR article 75 is based upon the consent of the parties. Any fair reading of the papers before me would lead to the conclusion that the question of consent here is debatable. The petitioners’ election to proceed in the courts of this State was described by the Bais Din as "terrible error.” Consent to the submission of disputes to a rabbinical tribunal given to avoid ecclesiastical condemnation is not remarkable *766 from a religious standpoint. However, such an interpretation of consent is somewhat suspect from the perspective of CPLR article 75 (CPLR 7501). As previously noted, the generally accepted notions of consent imply informed consent. Where, as here, the agreement designates a particular arbitrator or arbitrators to preside, there can be no meaningful consent absent full disclosure of prior relationships between the arbitrator and a party.
This requirement of impartiality is even more significant in the case of a Bais Din than in a commercial arbitration because of the nature of the inquiry conducted by the rabbinical tribunal. This was, in truth, not the arbitration of a commercial dispute between family members. It was, in fact, an attempt to mend a family dispute having commercial implications. This is clear from the affidavits of the several rabbis which indicate that not only the agreements, but also the conduct of the parties was considered. In reaching their "peshara” or compromise verdict, the rabbis also were influenced by the need for family harmony and Hyman Fein’s "lack of entrepreneurial talent.” While such factors are clearly appropriate for consideration in the setting of a Bais Din, they are not the customary elements of commercial arbitration under CPLR article 75. The propriety of a compromise is not at issue (Kingsbridge Ctr. v Turk, 98 AD2d 664). However, the lack of objective standards and the fact that the Bais Din is the sole arbiter of procedural and substantive Jewish law renders review by the court virtually impossible. I take it as a given that a court’s review of the determination is limited in any case, and that petitioners bear a heavy burden in demonstrating prejudice. (Rose v Lowery & Co., 181 AD2d 418.) However, where, as here, the tribunal produces a decision which cannot be weighed against any objective standard by a secular court, the risk that prejudice from some undisclosed relationship will go undetected is heightened. As the Court of Appeals noted in Matter of Goldfinger v Lisker (68 NY2d 225, 230): "Precisely because arbitration awards are subject to such judicial deference, it is imperative that the integrity of the process, as opposed to the correctness of the individual decision, be zealously safeguarded.”
If the judicial deference represented by the imprimatur of CPLR article 75 is to be afforded the ruling of a Bais Din, nothing less than full disclosure will ensure the integrity of the process.
The final factor or group of factors are the various proce *767 dures employed by the Bais Din, procedures which the petitioners describe as "bizarre and medieval.” In fact, the use of arbitral institutions antedates the Middle Ages and trial by ordeal. (Matter of Mikel [Scharf], 105 Misc 2d 548.) While the practice before the Bais Din may not fairly be characterized as "bizarre or medieval,” it is also not consistent with the concepts which the CPLR generally considers fundamental to commercial arbitration (Matter of Goldfinger v Lisker, 68 NY2d 225, supra). Some of the inconsistencies include limits on cross-examination (CPLR 7506 [c]), limitations on the participation of counsel (CPLR 7506 [d]), as well as the solicitation or acceptance of ex parte communications from parties and third parties. These differences are explained by the different missions of routine commercial arbitration and the administration of Jewish law by a Bais Din. These missions are not necessarily mutually exclusive but neither are they necessarily identical. There is no question that some procedural variations may be waived and that some may not (Matter of Mikel v Scharf, 85 AD2d 604), and there are abundant factual issues here regarding the degree to which such procedural variations may have occurred and if so, whether they were waived. As noted, I do not believe it is necessary to resolve the factual issues presented. I have discussed them only to make one point. For the purposes of enforcement under CPLR article 75, the need to guarantee impartiality of the arbitrator increases in direct proportion to the degree to which the tribunal departs from procedural requirements common to statutory arbitration.
In sum, I believe that given the unique characteristics of arbitration before the rabbinical tribunal known as a Bais Din, there exists an absolute duty to disclose any indicia of possible bias before execution of a submission agreement and that this obligation cannot be waived. Such a waiver would be inconsistent with the knowing consent required as a precondition to an agreement to arbitrate cognizable under CPLR article 75. Absent such an agreement, I have no power to act within the statutory framework of CPLR article 75 and I cannot confirm, vacate, or remand this matter. This is not only an appropriate determination, but it avoids some results which range from the questionable to the absurd. It does not require that I confirm an award which arises from procedures which do not comport with statute. It does not require that I vacate the award and thereby challenge the rabbis’ enforcement techniques, an exercise as appropriate as annulling an *768 Amish "shunning.” It does not require that I remand the matter, as the petitioners suggest, to a body unauthorized by law or agreement, or to a new Bais Din selected by me. (CPLR 7504.)
The petition and cross petition are dismissed and the temporary restraining order is vacated. The applications by petitioners and respondents seeking discovery are denied.
As a closing note, this matter has raised interesting questions and was well presented by counsel. I also have some mild curiosity as to whether petitioners will fare better at the hands of the secular courts than at the hands of their brethren. However, calendar conditions preclude me from selecting cases which interest me from the various counties of this State. For this reason, further proceedings should be commenced in counties which have some apparent relation to the parties or matters at issue.